**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

OUTSIDE INTERACTIVE, INC.,

      Plaintiff,

v.

JOSHUA BOLIN et al.,

      Defendants.

---

## PLAINTIFF'S COMBINED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

20070217.10

Plaintiff Outside Interactive, Inc. ("Outside") hereby applies *ex parte* for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, pursuant to Federal Rule of Procedure 65 and Section 34 of the Lanham Act, 15 U.S.C. § 1116. Outside respectfully requests that the Court immediately order Defendants Joshua Bolin and Westlake Securities, LLC ("Westlake Securities" and together with Mr. Bolin, "Defendants") to cease and desist from operating the website (the "Infringing Website") at www.outside.com (the "Infringing Domain Name"), and that Bolin, the owner, provisionally transfer the Infringing Domain Name to Outside or, in the alternative, be prohibited from selling, transferring, or otherwise disposing of the Infringing Domain Name.

20070217.10

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ ii

II.     FACTUAL BACKGROUND ................................................................................ 3
        A.      Outside's Intellectual Property Rights ...................................................... 3
        B.      Defendants' Unlawful and Infringing Actions ............................................ 5

III.    LEGAL STANDARD .......................................................................................... 12

IV.     ARGUMENT ...................................................................................................... 15
        A.      Outside is Likely to Succeed on the Merits at Trial of this Action ............. 15
                1.      Outside is Likely to Succeed on Its Cybersquatting Claims .......... 15
                2.      Outside is Likely to Succeed on Its Infringement Claims .............. 19
                3.      Outside is Likely to Succeed on Its Contributory Infringement
                        Claim .............................................................................................. 22
        B.      Outside is Suffering and Will Continue to Suffer Irreparable Harm
                Absent Injunctive Relief in the Form of an *Ex Parte* Temporary
                Restraining Order ................................................................................... 23
        C.      The Balance of Hardships Favors Outside ............................................... 24
        D.      Enjoining Defendants' Activities Will Serve the Public Interest ................. 25
        E.      *Ex Parte* Relief is Warranted .................................................................. 25

V.      CONCLUSION ................................................................................................... 28

20070217.10

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
  722 F.3d 1229 (10th Cir. 2013) .......................................................................... 19, 22

*Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*,
  935 F.3d 1112 (10th Cir. 2019) ................................................................................ 20

*Am. Acad. of Husband-Coached Childbirth v. Thomas*,
  No. 10-CV-2899-CMA-MEH, 2010 WL 5184779 (D. Colo. Dec. 15, 2010) ........ 18, 25

*Ball Dynamics Int'l, LLC v. Saunders*,
  No. 16-CV-00482-NYW, 2016 WL 7034974 (D. Colo. Dec. 1, 2016) .................. 17-18

*Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona*,
  330 F.3d 617 (4th Cir. 2003) .................................................................................... 17

*Beer Nuts, Inc. v. Clover Club Foods Co.*,
  805 F.2d 920 (10th Cir. 1986) .................................................................................. 19

*Bella Health & Wellness v. Weiser*,
  669 F. Supp. 3d 1125 (D. Colo. 2023) ...................................................................... 13

*Big O Tires, Inc. v. Bigfoot 4X4, Inc.*,
  167 F. Supp. 2d 1216 (D. Colo. 2001) ................................................................ 13, 25

*Bray v. QFA Royalties LLC*,
  486 F. Supp. 2d 1237 (D. Colo. 2007) ...................................................................... 23

*Carranza v. Reams*,
  614 F. Supp. 3d 899 (D. Colo. 2020) ........................................................................ 27

*Cent. Bancorp, Inc. v. Cent. Bancompany, Inc.*,
  385 F. Supp. 3d 1122 (D. Colo. 2019) ................................................................. 20, 21

*Cont'l Oil Co. v. Frontier Ref. Co.*,
  338 F.2d 780 (10th Cir. 1964) .................................................................................. 27

*Crossfit, Inc. v. 5280 Realty, Inc.*,
  157 F. Supp. 3d 954 (D. Colo. 2016) ................................................................... 15-18

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*CrossFit, Inc. v. Jenkins*,
    69 F. Supp. 3d 1088 (D. Colo. 2014) ........................................................... 15-18, 23

*Derma Pen, LLC v. 4EverYoung Ltd.*,
    773 F.3d 1117 (10th Cir. 2014) ........................................................................... 12, 19

*Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Med. Ctr., LLC*,
    503 F. App'x 616 (10th Cir. 2012) .............................................................................. 20

*Jayme LLC v. Cheyenne Hotels LLC*,
    No. 18-CV-01014-RBJ, 2018 WL 6249690 (D. Colo. July 17, 2018) ...................... 25

*Mariah Media Inc. v. First Place Internet Inc.*,
    Case No. D2006-1275 ................................................................................................... 5

*Newport News Holdings Corp. v. Virtual City Vision, Inc.*,
    650 F.3d 423 (4th Cir. 2011) ...................................................................................... 17

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
    389 F.3d 973 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O*
    *Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006)...................... 12

*O'Banion v. Matevousian*,
    No. 19-CV-2517-WJM-KLM, 2020 WL 5559473 (D. Colo. Sept. 17, 2020) ............. 21

*Omega SA v. 375 Canal*,
    LLC, 984 F.3d 244 (2d Cir. 2021) ............................................................................. 22

*Otter Prod., LLC v. Seal Shield, LLC*,
    No. 13-CV-01734-MSK-MJW, 2014 WL 1213475 (D. Colo. Mar. 24, 2014) .............. 8

*Prudential Ins. Co. of Am. v. Shenzhen Stone Network Info. Ltd.*,
    58 F.4th 785 (4th Cir. 2023)....................................................................................... 17

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) .................................................................................. 24

iii

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Rylee & Cru, Inc. v. Zhu*,
No. 23-CV-00120-PAB, 2023 WL 2187480 (D. Colo. Feb. 23, 2023) ..... 12-13, 23-25

*Rylee & Cru, Inc. v. Zhu*,
No. 23-CV-00120-PAB-STV, 2024 WL 2111572 (D. Colo. May 10, 2024) ............. 26

*Sallen v. Corinthians Licenciamentos LTDA*,
273 F.3d 14 (1st Cir. 2001) ...................................................................... 17

*Schmidheiny v. Weber*,
319 F.3d 581 (3d Cir. 2003) ..................................................................... 17

*Statera, Inc. v. Henrickson*,
No. CIV.A. 09-CV-01684-J, 2009 WL 2169235 (D. Colo. July 17, 2009) ................ 26

*Storey v. Cello Holdings, LLC*,
347 F.3d 370 (2d Cir. 2003) ...................................................................... 17

*Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. at Thunderhead Ranch*,
23 F.4th 1262 (10th Cir. 2022) .............................................................. 12, 23

*U2 Home Entm't, Inc. v. Chun Pook Tan*,
209 F. Supp. 2d 299 (S.D.N.Y. 2002) ...................................................... 26

*United States Pat. & Trademark Off. v. Booking.com B.V.*,
591 U.S. 549 (2020) ................................................................................. 15

*Your True Nature, Inc. v. JF Show Store*,
No. 23-CV-00107-CNS-NRN, 2023 WL 2359234 (D. Colo. Feb. 14, 2023) ............. 23

**STATUTES**

15 U.S.C.
§ 1065 ............................................................................................... 5, 19
§ 1114 .............................................................................................. 14, 19
§ 1116(a) ............................................................................................... 23
§ 1116(d)(1)(A) ................................................................................. 13, 26
§ 1116(d)(4)(A) ................................................................................. 14, 27

iv

**TABLE OF AUTHORITIES**
<u>(continued)</u>

**<u>Page(s)</u>**

§ 1116(d)(4)(B) ................................................................................ 14

§ 1125(a) ........................................................................................ 19

§ 1125(d) ................................................................................... 15, 17

§ 1125(d)(1)(C) ............................................................................... 13

**OTHER AUTHORITIES**

Fed. R. Civ. P.

65(b) ............................................................................................... 13

65(b)(1) ........................................................................................... 26

20070217.10

## I.      INTRODUCTION

Through this *ex parte* application, Outside respectfully requests that the Court immediately order Defendants cease and desist from operating an infringing website (the "Infringing Website") at www.outside.com (the "Infringing Domain Name"), and that Bolin, the owner, provisionally transfer the Infringing Domain Name to Outside or, in the alternative, be prohibited from selling, transferring, or otherwise disposing of the Infringing Domain Name. Urgent intervention is necessary, as Defendants have recently posted on the Infringing Website at that Infringing Domain Name, and have repeatedly threatened to sell the Infringing Domain Name to a third party, putting it out of Outside's reach, should Outside not meet Defendants' extortionate purchase price.

For decades, Outside has been a leading provider of active lifestyle content, video, events, and services for outdoor enthusiasts and now reaches 80 million consumers across its network of 25 media, digital, and technology platforms. Defendants, taking advantage of Outside's careful cultivation of its brand and long-standing reputation, have attempted to use the Infringing Domain Name as a vehicle for extracting what is akin to a ransom payment. Specifically, Defendants launched the Infringing Website which purports to offer the very same services as Outside offers under the Infringing Domain Name, resulting in—by Defendants' own admission—confusion by the public and other damage to Outside's brand.

Given how seriously Outside takes protection of its intellectual property, and plainly willfully blind to the law, Defendants believed Outside would pay any price to stop a

20070217.10

potential competitor from holding the Infringing Domain and the confusion that Defendants intentionally manufactured. Defendants made frequent attempts to compel Outside to write an eight-figure check under duress including, for example, by placing time deadlines on Outside to accept their offer, or lose the Infringing Domain Name to a third-party buyer. Outside was unwilling to bend to their demands—which amounted to illegal cybersquatting.

Further still, in the attempt to extract the largest profit possible, Defendant Bolin (with encouragement by Westside Securities) has infringed and continues to infringe Outside's trademarks with full knowledge of Outside's exclusive rights and with deliberate intention to cause mistake and confuse or deceive the general public as to the affiliation, connection, or association of the Infringing Website with Outside. Accordingly, Outside requires this Court's immediate intervention to prevent further damage caused by Defendants' various violations of the Lanham Act. As set forth in detail herein, Outside satisfies all the relevant criteria for the issuance of an *ex parte* temporary restraining order and a preliminary injunction.

First, Outside is likely to succeed on the merits of its cybersquatting claim because it owns long-distinctive trademarks, Defendants have registered and used an admittedly identical domain name to those distinctive trademarks, and Defendants have attempted to extract an extortionate price for the sale of the domain to Outside—the "quintessential" example of bad faith intent to profit. Similarly, Outside is likely to succeed on its infringement claims because its trademarks are valid, federally-registered trademarks

2

(many of which are incontestable) and Defendants' actions have led to a likelihood of confusion that the Infringing Domain Name and Infringing Website are affiliated with Outside, when they are not.

The other factors are easily met here. Where, as here, a trademark plaintiff establishes a likelihood of success on liability, irreparable harm is presumed. The balance of hardships unquestionably and overwhelmingly favors Outside, as the only "harm" to Defendants would be the loss of their ability to extort Outside and confuse consumers— or, in other words, the loss of the ability to unfairly profit from their illegal and infringing activities. And the public has an interest in avoiding customer confusion resulting from cybersquatting and, further, because Outside has established that Defendants' use is likely to cause, and has caused confusion, it follows that if such use continues, the public interest would be damaged. Outside has met all the requirements for an *ex parte* order— including showing that Defendants would be likely to put the Infringing Domain Name beyond Outside's reach. In light of the foregoing, Outside respectfully requests that the Court grant its requested relief.

## II.     FACTUAL BACKGROUND

### A.     Outside's Intellectual Property Rights

For decades, Outside has been a leading provider of active lifestyle content, video, events, and services for outdoor enthusiasts. Declaration of Sam Gorman ("Gorman Decl.") ¶ 2. Outside currently reaches 80 million consumers across its network of 25

20070217.10

media, digital, and technology platforms. *Id*. Outside has been using the trademark OUTSIDE® for informational publications pertaining to recreation since 1976, before the internet was founded. Declaration of Eleanor M. Lackman ("Lackman Decl.") ¶ 2.

Outside's trademark rights and portfolio have since grown dramatically. *See id*. ¶¶ 2-4. It launched its magazine *Outside*, which provides information in the fields of outdoor sports, fitness, and recreational activities, in November 1994. *Id.* ¶ 2. In the mid-to-late 1990s, Outside added an online presence, television channel, travel, transportation, and retail store offerings and a book imprint. *Id.* It has offered travel agency services for more than a decade—not to mention various other goods and services under dozens of sub-brands offered by, and recognized as affiliated with, Outside. *Id.*; Gorman Decl. ¶ 2. This includes "Scout – powered by Outside AI," Outside's AI-powered adventure concierge, which launched in January 2024. Gorman Decl. ¶ 2.

Outside owns all right, title, and interest in and to the marks in its OUTSIDE® family of marks, including but not limited to OUTSIDE®, OUTSIDE BOOKS®, OUTSIDE FILMS®, OUTSIDE GO®, OUTSIDE ONLINE®, OUTSIDE TELEVISION®, OUTSIDE TV®, OUTSIDE EVENTS®, and various designs and stylizations thereof (collectively, the "OUTSIDE® Marks"). Lackman Decl. ¶¶ 3-4. As a result of (a) Outside's consistent and exclusive use of the OUTSIDE® Marks, (b) Outside's extensive advertising of its services offered under the OUTSIDE® Marks, and (c) the mass popularity and extensive reach of Outside platforms, Outside has created substantial goodwill in its OUTSIDE® Marks across the United States (and beyond). *See id.*; Gorman Decl. ¶ 2. To further protect its

valuable names and brand, Outside has obtained multiple federal trademark registrations for the OUTSIDE® Marks (the "Registrations"). *See* Lackman Decl., Ex. A. Outside obtained the first of these Registrations in 1988 based on a first use date in commerce of November 1, 1976. Lackman Decl. ¶ 4.

As identified in the Registrations, Outside has offered and continues to offer a wide variety of online services in connection with the OUTSIDE® Marks. *See* Lackman Decl., Ex. A; Compl. ¶ 15. The Registrations for the OUTSIDE® Marks are in full force and effect, and the vast majority have become incontestable pursuant to 15 U.S.C. § 1065. *See* Lackman Decl., Ex. A; Compl. Ex. A.

**B.   Defendants' Unlawful and Infringing Actions**

The Infringing Domain Name was first registered in 1993, after OUTSIDE® became a registered trademark of Outside, by a third party other than Defendants. The Infringing Domain Name continued to transfer hands until Defendant Bolin ultimately came to own it at some point in time.[1]

For several years, no content appeared at the Infringing Domain Name, but that changed in late April 2024, when Bolin through David Hill, a managing director for

---

[1] In 2006, Outside's predecessor-in-interest brought a complaint against First Place Internet, Inc., another prior owner, not Defendants, before the World Intellectual Property Organization Arbitration and Mediation Center ("WIPO") seeking transfer of the Infringing Domain Name, pursuant to the Uniform Domain-Name Dispute Resolution Policy (UDRP). *See Mariah Media Inc. v. First Place Internet Inc.*, Case No. D2006-1275. The complaint was unsuccessful as, at that time, under WIPO's standards, there was no evidence that the website at the domain name at the time was not illegitimate, and there was no evidence that the owner had registered or used the domain name in bad faith.

5

Defendant Westlake Securities, which purported to act on behalf of Bolin, contacted Outside with a proposal: to sell the Infringing Domain Name to Outside. Gorman Decl. ¶ 3. While Defendants continued to pitch to Outside, Outside discovered that in addition to Bolin's plan to commercialize the Infringing Domain Name by trying to sell it, Bolin had launched the Infringing Website. *Id.* It became apparent that Defendants intended to extort Outside through this sale. *See id.* ¶¶ 4-5. Outside was troubled by this development but, knowing that the cost of litigation is high, started with a pragmatic approach. Accordingly, Outside and Defendants engaged in a series of conversations from April to June 2024, attempting to negotiate a potential purchase at a reasonable price, one that would have to be much lower than the price of suing to obtain the Infringing Domain Name. *Id*. ¶ 4.

However, Defendants were uninterested in a reasonable resolution; in fact, they took the overture as a basis to escalate. For instance, during the course of these discussions, Defendants claimed the Infringing Website offered various services, including an AI-driven search engine for outdoor activities. *Id.* Defendants expressly indicated that their OUTSIDE-branded site would threaten what Defendants incorrectly characterized as Outside's "old-school publisher"-based business model, and that acquiring it (at an exorbitant price) could "save Outside's business." *Id.* Defendants made it clear that the Infringing Website would take traffic and readers from Outside and those familiar with the Outside brand, capitalizing and free-riding on Outside's reputation and brand, which was likely to confuse some segment of the public into thinking that Outside

20070217.10

was associated with the Infringing Website. *Id.* Indeed, they admitted that individuals had mistakenly contacted them through emails at the Infringing Domain Name, including providing sensitive information, on the false belief that they were corresponding with Outside. *Id.* Defendants further explained that the Infringing Website had received significant traffic on the back of the Outside name and brand, thereby clearly capitalizing on the confusion of consumers. *Id.*

Defendants demanded that because of this confusion—created as a result of their unauthorized trading on Outside's goodwill in the OUTSIDE® Marks—Outside should pay a staggering number of between ***15 million and 25 million dollars*** to purchase the Infringing Domain Name. *Id.* ¶ 5. Defendants postured that other buyers (including a "large retailer" that purportedly would find such price "immaterial') had expressed interest in purchasing the Infringing Domain Name. *Id.* Defendants leveraged this point to claim that unless Outside met Defendants' extortionate price, they would either proceed with their competing "AI-driven" business model or the Infringing Domain Name would be lost to another buyer. *Id.* Defendants even went so far as imposing a time window on certain offers to purchase it; otherwise they would continue with their infringing business or sell the Infringing Domain Name to a competitor—tantamount to holding the domain name as a type of ransom.[2] *Id.*

---

[2] Prior to Defendants revealing their malicious intentions and unlawful demands, Outside and Bolin entered into a non-disclosure agreement regarding the anticipated business discussion. Gorman Decl. ¶ 5. Under the circumstances, the agreement should not bar Outside from presenting the facts relevant to this case otherwise it would "prevent

A review of the Infringing Website makes clear how Defendants manufactured the confusion underlying their demands. At least until around early August (shortly after Defendants' receipt of a communication from Outside's counsel), the Infringing Website purported to, and did, offer the very same services that Outside offers in connection with its OUTSIDE® Marks. *Id*. ¶ 6, Ex. A. The "About Us" page of the Infringing Website page stated "[u]tilizing advanced AI algorithms, we analyze your preferences, past activities, and search patterns to suggest the outdoor experiences most exciting to you and your family . . . making booking and buying the essentials for your outing faster and more intuitive than ever before." *Id*. The Infringing Website also supposedly provided "real-time information on weather conditions, trail updates, and even crowd sizes, helping you make the most informed decisions" and gave consumers the ability to "[c]onnect with fellow outdoor lovers, share experiences, and get inspired." *Id*. Further, the Infringing Website also purported to offer travel booking services for outdoor experiences, retail services for outdoor products, and location-based map services. *Id*. Indeed, as a simple search on the Infringing Website shows, the Infringing Website returns content on outdoor experiences, travel planning, products and other similar information. *Id*. All of this overlaps with Outside's business. *See id*. ¶ 2; Lackman Decl. ¶ 2 & Ex. A; Compl. ¶ 15.

---

presentation of relevant, truthful evidence to a fact-finder and court." *Otter Prod., LLC v. Seal Shield, LLC*, No. 13-CV-01734-MSK-MJW, 2014 WL 1213475, at *6 (D. Colo. Mar. 24, 2014). Thus, "[e]nforcement of such provision clearly would not serve the public interest and likely is void as against public policy." *Id*. Further, Bolin's approach and proposed sale price is not "confidential information" in any event.

8

The copyright notice on the Infringing Website identified "Outside" as the owner of the website—not Bolin, Outside.com, or any other third party, but "Copyright © 2024 Outside." Gorman Decl. ¶ 8, Ex. C. Further still, searching the terms "outside" or "outside.com" in the search bar on the Infringing Website not only returned an article about planning outdoor experiences but also Outside's stylized OUTSIDE® mark, which depiction hyperlinks to an article about Outside's publication *Outside* and gives off the impression that outside.com is Outside's website:





*Id*. ¶ 9, Ex. D.

Upon realizing Defendants' intent to trade on Outside's goodwill and use the resulting likelihood of confusion to extort Outside for at least $15 million, Outside wrote to Defendants through counsel on June 28, 2024 to advise Defendants of their unlawful and infringing acts and to seek a resolution short of litigation. *Id*. ¶ 10. Bolin, without copying Westlake Securities, responded later that day, indicating it would not entertain any such resolution. Lackman Decl. ¶ 8. On July 15, 2024, counsel for Outside sent one more letter to Bolin in a final attempt to avoid litigation. *Id.* As of the date of filing, neither of the Defendants have replied to the latest communication they received. *Id*.

Rather, it appears that Defendants have escalated their unlawful conduct. Since sending the letter of July 15, 2024, the Infringing Website now features a "Partner With Us" page soliciting brand and affiliate partners. Gorman Decl. ¶ 11, Ex. E. Notably, the

notice identifying "Outside" as the owner of the Infringing Website was directly below the "Partner With Us" hyperlink—a clear attempt at misleading potential partners seeking affiliate revenue into falsely believing they are doing business with Outside. *Id.* (The Infringing Website now identifies "Outside.com" as the owner. *See id.*, Ex. F.)

Then, in a gesture of defiance at the suggestion that extortion and unfair competition might be illegal, in or around the first week of August, 2024, Bolin updated the content of the Infringing Website. *See id.* ¶ 12, Ex. F. For example, the "About us" page now refers to the operator of the site being "an American software company dedicated to unraveling the intricacies of God's creation through the lens of advanced technology." *Id.* Among other things, the updated Infringing Website claims it offers a "Gardening and Plants Large Language Model (GPLLM)"—an enormous artificial intelligence system that advertises as its value the ability of this AI to tell you when it is best to water your plants and which solutions help kill pests. *Id.*

Nonetheless, a search for "Outside.com" has continued to return a description of Outside, a reference to Outside's website, and a link to Outside's website. *Id.* ¶ 9. Evidently, Defendants' attempt to cover their tracks has failed, and Defendants' flippant and erratic behavior, showing disregard for the law and the value of (and injury to) Outside's rights, is just more of the same in Defendants' misguided efforts to menace Outside into paying an eight-figure sum to keep its rights from being trampled upon.

20070217.10

## III.     LEGAL STANDARD

To obtain a preliminary injunction, a Plaintiff must show: (1) it is likely to succeed on the merits of its claim, (2) the denial of the injunction would result in irreparable harm, (3) a balancing of equities favors the injunction, and (4) an injunction is consistent with the public interest. *Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1119 (10th Cir. 2014). For injunctions that alter the status quo or mandatory preliminary injunctions requiring the non-moving party to take some affirmative action, the movant "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms[.]" *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975-76 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).[3]

Under the Trademark Modernization Act, a plaintiff seeking a temporary restraining order or preliminary injunction on the basis of trademark claims arising under the Lanham Act "shall be entitled to a rebuttable presumption of irreparable harm upon ... a finding of likelihood of success on the merits.'" *Rylee & Cru, Inc. v. Zhu*, No. 23-CV-00120-PAB, 2023 WL 2187480, at *3 (D. Colo. Feb. 23, 2023) (Brimmer, J.) (quoting 15 U.S.C. § 1116(a) (alterations in original)); *see also Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. at Thunderhead Ranch,* 23 F.4th 1262, 1270 (10th Cir. 2022) ("Congress amended

[3] Outside seeks affirmative interim relief only as to the disabling of the Infringing Website during the pendency of this proceeding, as well as the temporary transfer of the Infringing Domain Name to ensure that Defendants do not make good on their threats to sell it to some third party that is beyond the Court's reach. *See* Lackman Decl. ¶¶ 5-7.

20070217.10

the Lanham Act to expressly allow a presumption of irreparable injury when the owner of a trademark proves likelihood of success on the merits").

"Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1228 (D. Colo. 2001) (citations omitted). Moreover, "[t]he public has an interest in avoiding customer confusion resulting from cybersquatting." *See Rylee & Cru*, 2023 WL 2187480, at *3.

The standards governing consideration of an application for a temporary restraining order are the same standards as those which govern a preliminary injunction. *Bella Health & Wellness v. Weiser*, 669 F. Supp. 3d 1125, 1129 (D. Colo. 2023). In addition, an *ex parte* temporary restraining order may be granted where "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b). Further, under the Lanham Act, "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C); *Rylee & Cru*, 2023 WL 2187480, at *3 (granting application for temporary restraining order ordering the transfer of an infringing domain name to plaintiff).

The Lanham Act also expressly authorizes this Court to issue *ex parte* restraining orders "with respect to a violation [of the Act] that consists of using a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C.

20070217.10

§ 1116(d)(1)(A). [4] This constitutes a separate, additional ground for the requested relief. Specifically, the Lanham Act provides that a court may grant an *ex parte* order for seizure of counterfeit marks upon a showing that the plaintiff will provide adequate security, in an amount to be determined by the court, and that (i) any order other than an *ex parte* order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (ii) the plaintiff has not publicized the requested *ex parte* order; (iii) the plaintiff is likely to succeed in showing that defendants are using counterfeit marks; (iv) an immediate and irreparable injury will occur if such *ex parte* order is not granted; (v) the materials to be seized will be located at the place identified in the application; (vi) the harm to the plaintiff in denying the application outweighs the harm to defendants in granting the order and (vii) if prior notice was given, defendants would destroy, move, hide or otherwise make such matter inaccessible to the Court. 15 U.S.C. § 1116(d)(4)(A)-(B).

As discussed below, Outside meets each of the relevant criteria for a preliminary injunction and for the issuance of an *ex parte* temporary restraining order under the Lanham Act.

---

[4] One purpose of such *ex parte* remedies is to prevent counterfeiters given prior notice from disappearing or quickly disposing of infringing inventory or records relating to their counterfeiting and illegal actions. *See* Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, l30 Cong. Rec. H12076, at 12080 (Oct. 10, 1984).

20070217.10

## IV.      ARGUMENT

### A.      Outside is Likely to Succeed on the Merits at Trial of this Action

#### 1.      Outside is Likely to Succeed on Its Cybersquatting Claims

A plaintiff will prevail on a claim for cybersquatting under Section 43(d) of the Lanham Act, if it establishes: (1) that its trademark was distinctive at the time of the defendant's registration of the domain name; (2) that the domain name registered, trafficked in, or used by the defendant was identical or confusingly similar to the trademark; and (3) that the defendant used or registered the domain name with a bad faith intent to profit. *Crossfit, Inc. v. 5280 Realty, Inc.,* 157 F. Supp. 3d 954, 957-58 (D. Colo. 2016) (hereinafter, "*5280 Realty*"). The evidence establishes each element here.

*First*, the OUTSIDE® Marks were distinctive at the time of Bolin's registration of the Infringing Domain Name. "The owner of a mark on the principal register enjoys 'valuable benefits,' including a presumption that the mark is valid" and "[t]he most distinctive marks . . . may be placed on the principal register because they are 'inherently distinctive.'" *United States Pat. & Trademark Off. v. Booking.com B.V.*, 591 U.S. 549, 552 (2020). Here, Outside holds a trove of Registrations on the Principal Register, thus establishing their distinctiveness. *See* Lackman Decl, Ex. A; *CrossFit, Inc. v. Jenkins*, 69 F. Supp. 3d 1088, 1098 (D. Colo. 2014) (hereinafter, "*Jenkins*") (finding registration of a trademark evidences the distinctiveness of the mark in cybersquatting claim).

Additionally, "the court may consider several factors, including the degree of inherent or acquired distinctiveness of the mark, the duration and extent of use of the

20070217.10

mark in connection with the goods or services with which the mark is used, and the duration and extent of advertising and publicity of the mark, among others." *5280 Realty,* 157 F. Supp. 3d at 958. Each of these factors favor Outside. It has been using the OUTSIDE® Marks exclusively for decades. *See* Lackman Decl. ¶¶ 2-4. Its efforts in promoting, maintaining, and protecting its OUTSIDE® marks have created considerable goodwill in those marks. Consumers in the United States (and across the world) associate the OUTSIDE® Marks with Outside alone. *See id.*; Gorman Decl. ¶ 2. And the OUTSIDE® Marks have a high amount of publicity as shown by the nearly 80 million consumers that use its services. *See* Gorman Decl. ¶ 2. As such, the evidence clearly establishes that Outside has "amass[ed] considerable goodwill within its industry"; the OUTSIDE® Marks are " widely recognized around the world"; "[c]onsumers readily and singularly associate the [OUTSIDE® Marks] with [Outside's] business and services"; and that Outside "protects its intellectual property through, *inter alia,* trademark and service mark registration[.]" *Jenkins*, 69 F. Supp. at 1098. Thus, the OUTSIDE® Marks have been distinctive for many years, including when Bolin re-registered the Infringing Domain Name. [5]

---

[5] Given Outside had registered its OUTSIDE mark on the Principal Register in 1988, the mark was also distinctive at the time of the initial registration of the Infringing Domain Name by a third party in 1993. *See* Lackman Decl. ¶¶ 2, 4.

20070217.10

*Second*, Bolin, by his admission, has registered and uses the Infringing Domain Name, outside.com.[6] Outside.com is at minimum confusingly similar, if not identical, to the mark OUTSIDE® and family of OUTSIDE® Marks, as it copies the root mark OUTSIDE® in its entirety. The addition of the generic suffix ".com" does nothing to change this analysis. *See Ball Dynamics Int'l, LLC v. Saunders*, No. 16-CV-00482-NYW, 2016 WL 7034974, at *7 (D. Colo. Dec. 1, 2016) (finding URLs confusingly similar to plaintiff's mark as they "merely change the domain extension"); *see also 5280 Realty*, 157 F. Supp. 3d at 958-59 (similar; collecting cases). Thus, there can be no real dispute that Bolin registered, trafficked in, or used a domain name identical or confusingly similar to Outside's trademarks. *See Jenkins*, 69 F. Supp. 3d at 1096-99; *5280 Realty,* 157 F. Supp. 3d at 958-60.[7]

---

[6] While Outside had rights predating the first registration date, the fact that the domain name existed as far back as 1993 is irrelevant to any current analysis. Both re-registration and current use of a domain name can create liability under Section 43(d). *See, e.g., Prudential Ins. Co. of Am. v. Shenzhen Stone Network Info. Ltd.*, 58 F.4th 785, 796 (4th Cir. 2023) (to "register" means not just the first registration, but any subsequent re-registration); *Schmidheiny v. Weber*, 319 F.3d 581, 583 (3d Cir. 2003) (same); *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 436 (4th Cir. 2011) (shifting in activities from informational to acting as a commercial competitor led to inference of bad faith). According to the public records of the Internet Corporation for Assigned Names and Numbers (ICANN), the Infringing Domain Name was re-registered on April 29, 2024. Lackman Decl. ¶ 10.

[7] Any effort by Defendants to try to invoke the 2006 UDRP proceeding (*see* n. 1, *supra*), will fail, and not only because the use then is different from now. The circuits that have looked into the question uniformly hold that UDRP decisions are not binding on federal courts. *See, e.g.*, *Storey v. Cello Holdings, LLC*, 347 F.3d 370 (2d Cir. 2003); *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona*, 330 F.3d 617 (4th Cir. 2003); *Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 26 (1st Cir. 2001).

17

*Third*, and finally, "[t]he quintessential example of a bad faith intent to profit is when a defendant purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price." *5280 Realty,* 157 F. Supp. 3d at 960 (quoting *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch.*, 527 F.3d 1045, 1058 (10th Cir. 2008)). That is precisely what both Bolin and his agent Westlake Securities have done here. *See* Gorman Decl. ¶ 5. This alone would be sufficient to show Bolin's bad faith intent to profit.

Worse though, Defendants have admitted repeatedly that the purpose in registering and using the Infringing Domain Name has been to misdirect Outside's consumers to the Infringing Website, even after Outside warned them of the potential confusion. *See id.* ¶¶ 4-5. This, too, evidences Defendants' bad faith intent to profit. *See Jenkins*, 69 F. Supp. 3d at 1100-01 (finding bad faith from defendant's continued use of a domain name after plaintiff informed him of a likelihood of confusion); *Ball Dynamics Int'l*, 2016 WL 7034974, at *7 (likely success on merits where defendant used URLs to divert traffic from plaintiff's to defendant's site); *Am. Acad. of Husband-Coached Childbirth v. Thomas*, No. 10-CV-2899-CMA-MEH, 2010 WL 5184779, at *5 (D. Colo. Dec. 15, 2010) (similar).

In light of the above evidence, which includes explicit admissions by Defendants, there can be no question Outside is likely to succeed on its cybersquatting claim.

20070217.10

### 2.      Outside is Likely to Succeed on Its Infringement Claims

Claims for "trademark infringement (15 U.S.C. § 1114) and unfair competition (15 U.S.C. § 1125(a)) . . . include the same elements: (1) [Plaintiff] has a protectable interest in the trademark. (2) [Defendant] has used an identical or similar trademark in commerce. (3) [Defendant] has likely confused customers by using a similar trademark." *Derma Pen*, 773 F.3d at 1120.

*First*, the evidence establishes Outside has a protectable interest in the OUTSIDE® Marks. For one, Outside's Registrations for the OUTSIDE® Marks constitute "*prima facie* evidence of both the mark's validity and the registrant's exclusive right to use it in commerce." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013). Several of the Registrations have become incontestable pursuant to 15 U.S.C. § 1065. *See* Compl., Ex. A; Lackman Decl., Ex. A. As such, these OUTSIDE® Marks are further "conclusively presumed nondescriptive" and the Registrations constitute "conclusive evidence" of Outside's right to use the marks. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 924 (10th Cir. 1986). Thus, Defendants cannot genuinely dispute that Outside has valid and protectable rights in its OUTSIDE® Marks.

*Second*, Defendant Bolin has used both identical and similar trademarks to the OUTSIDE® Marks in commerce. Not only does the Infringing Domain Name, outside.com, copy Outside's word mark OUTSIDE® verbatim in its entirety, the Infringing Website also prominently features the word mark OUTSIDE® and purported to be owned

by "Outside." *See* Gorman Decl. ¶¶ 6-9. Again, there can be no meaningful dispute that Bolin uses identical, if not highly similar, marks in commerce.

*Third*, each of the six, non-exhaustive factors used to determine whether there is a likelihood of confusion favors Outside: "(1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks." *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019).

"[T]he degree of similarity is the most important factor," *id.*, and as noted above, the Infringing Website uses a counterfeit mark which copies Outside's marks identically, weighing heavily in favor of a finding of likelihood of confusion. *See id.* Turning to the next two factors, Defendants have admitted—indeed, touted—they intend to mislead consumers into believing the Infringing Website is affiliated with Outside, and further, that there has been actual confusion, with consumers and potential business partners contacting Bolin expecting to reach Outside. *See* Gorman Decl. ¶ 4; *Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Med. Ctr., LLC*, 503 F. App'x 616, 621 (10th Cir. 2012) (citing misplaced consumer inquiries in upholding preliminary injunction); *Cent. Bancorp, Inc. v. Cent. Bancompany, Inc.*, 385 F. Supp. 3d 1122, 1144 (D. Colo. 2019) (granting preliminary injunction on similar grounds).

The Infringing Website also purported to and did provide the exact same services that Outside offers, and for which it holds Registrations covering (Lackman Decl., Ex. A),

including providing information, planning, and booking resources for recreational experiences, online community boards to connect with outdoors enthusiasts, online retail services of recreational products, and location-based mapping services, to name just a few.[8] *See* Gorman Decl. ¶¶ 6-9; *Cent. Bancorp, Inc. v. Cent. Bancompany, Inc.*, 385 F. Supp. 3d 1122, 1144 (D. Colo. 2019) (granting preliminary injunction, highlighting "substantially overlapping services"). Given the nature of an online marketplace, consumers are not likely to exercise great care in selecting these services, especially considering the Infringing Domain Name and Infringing Website prominently feature a counterfeit of the OUTSIDE® word mark as well as when searching for the terms "outside" or "outside.com" Finally, Outside has used and promoted its OUTSIDE® Marks continuously for nearly half a century, resulting in 80 million consumers currently using Outside's services that it offers in connection with the OUTSIDE® Marks, thus demonstrating their commercial strength. *See* Gorman Decl. ¶ 2; Lackman Decl. ¶¶ 2, 4.

Thus, the evidence establishes a likelihood of confusion—confusion that Bolin has admitted he intends to cause and has been successful in causing.

---

[8] The recent updates to the Infringing Website do not change this analysis. While the "About Us" page has been altered, it still purports to provide information regarding certain recreational activities including through an AI-driven platform—both services that Outside offers in connection with its OUTSIDE® Marks, and presumably the Infringing Domain Name is still being offered to third parties, too. *See, e.g.*, *O'Banion v. Matevousian*, No. 19-CV-2517-WJM-KLM, 2020 WL 5559473, at *6 (D. Colo. Sept. 17, 2020) (finding defendants' subsequent remedial measures were irrelevant to injunctive relief inquiry because the measures differed from "the relief Plaintiff ultimately seeks").

21

20070217.10

3.      **Outside is Likely to Succeed on Its Contributory Infringement Claim**

"Contributory infringement occurs when the defendant either (1) intentionally induces a third party to infringe on the plaintiff's mark or (2) enables a third party to infringe on the mark while knowing or having reason to know that the third party is infringing, yet failing to take reasonable remedial measures." *1-800 Contacts*, 722 F.3d at 1249. Westlake Securities has been complicit in the attempted extortion of Outside in the sale of the Infringing Domain Name. Indeed, in the parties' discussions, Westlake Securities, equally with Bolin, postured that the purpose of the Infringing Website was to steal traffic and consumers from Outside. *See* Gorman Decl. ¶¶ 3-5. These actions not only demonstrate its knowledge of Bolin's infringement and that it did nothing to halt such infringement but also indicate that Westlake Securities encouraged Bolin to undertake the infringement so that Westlake Securities could drive the demanded purchase price (and thereby, its cut of the sale) higher. This supports a finding that Westlake Securities has committed contributory infringement. *1-800 Contacts*, 722 F.3d at 1251; *see Omega SA v. 375 Canal*, LLC, 984 F.3d 244, 255 (2d Cir. 2021).

*       *       *

Given this evidence, which includes several incontestable trademark Registrations owned by Outside for the OUTSIDE® Marks and Defendants' own admissions of bad faith intent to profit and actual confusion, Outside has made the requisite "strong showing" that it is likely to prevail on its claims for cybersquatting and trademark infringement under the

20070217.10

Lanham Act warranting the injunctive relief requested. *See Rylee & Cru*, 2023 WL 2187480, at *2-3 (granting temporary restraining order directing transfer of domain name under analogous facts).[9]

**B.      Outside is Suffering and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief in the Form of an *Ex Parte* Temporary Restraining Order**

As an initial matter, where a trademark plaintiff establishes a likelihood of success on liability, irreparable harm is presumed.  *See* 15 U.S.C. § 1116(a).  Therefore, because Outside is likely to succeed on the merits (*see supra* Section IV.A.), it is entitled to a presumption of irreparable harm that favors preliminary relief, which Defendants must rebut. *See, e.g.*, *Rylee & Cru*, 2023 WL 2187480, at *3 ("Because R & C has demonstrated a likelihood of success on the merits of its in rem cybersquatting claim, it is entitled to the presumption of irreparable harm."). *See also Trial Laws. Coll.*, 23 F.4th at 1270, 1273 (finding irreparable harm without relying on presumption because loss of goodwill is irreparable). Here, irreparable harm is irrefutable given the facts present here. *See* Lackman Decl. ¶¶ 2-4, 5-7; Gorman Decl. ¶¶ 2-11; *Bray v. QFA Royalties LLC*, 486

---

[9] Because of their unlawful actions in cybersquatting and trademark infringement as well as their transaction of business (providing services via the Infringing Website) within Colorado, this Court has personal jurisdiction over the Defendants. *See Jenkins*, 69 F. Supp. 3d at 1094 (personal jurisdiction warranted as a result of defendant's business in Colorado and "commission of a tort in Colorado," namely violation of the ACPA); *Your True Nature, Inc. v. JF Show Store*, No. 23-CV-00107-CNS-NRN, 2023 WL 2359234, at *2 (D. Colo. Feb. 14, 2023).

20070217.10

F. Supp. 2d 1237, 1249 (D. Colo. 2007) (loss of goodwill constituted irreparable injury). That Outside sought to resolve the matter before suing is irrelevant to the question here. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211-12 (10th Cir. 2009) (rejecting argument that time spent trying to resolve matter impacted irreparable harm).

For at least these reasons, absent an *ex parte* temporary restraining order and preliminary injunction, Outside will suffer irreparable harm to the reputation and substantial goodwill it has developed in the OUTSIDE® Marks over decades.[10] *Rylee & Cru,* 2023 WL 2187480, at *3.

**C.      The Balance of Hardships Favors Outside**

The balance of hardships unquestionably and overwhelmingly favors Outside.  As described above, Outside has suffered, and will continue to suffer, irreparable harm to its business, and the value, goodwill, and reputation built up in and associated with the OUTSIDE® Marks, as a result of Defendants' willful and knowing cybersquatting and infringement. On the other hand, the only potential "harm" to Defendants is the loss of their ability to extort Outside—or, in other words, the loss of the ability to unfairly profit from their illegal and infringing activities. Thus, Defendants "brought this situation on themselves by setting up [the Infringing Website]" such that the harm would not be

---

[10] As above, the recent updates to the Infringing Website do nothing to address the harm Outside will suffer absent immediate injunctive relief. The Infringing Website still counterfeits the OUTSIDE® Marks and still purports to provide overlapping services with those offered by Outside. Moreover, Defendants have yet to respond to Outside's correspondence and have the capacity to follow through on their repeated threats to put the Infringing Domain Name beyond Outside's reach by selling it to a third party.

24

cognizable under this factor, especially when "vastly outweigh[ed]" by the "significant harm to the goodwill and reputation of the [OUTSIDE®] marks[.]" *Am. Acad. of Husband-Coached Childbirth*, 2010 WL 5184779, at *6 (D. Colo. Dec. 15, 2010).

### D. Enjoining Defendants' Activities Will Serve the Public Interest

In a trademark case, public interest is "most often a synonym for the right of the public not to be deceived or confused." *Big O Tires*, 167 F. Supp. 2d at 1228 (D. Colo. 2001) (citations omitted); *see also Rylee & Cru,* 2023 WL 2187480, at *3 ("[t]he public has an interest in avoiding customer confusion resulting from cybersquatting."). Because Outside has established that Bolin's use is likely to cause confusion, and already has done so, "it follows that if such use continues, the public interest would be damaged," warranting the requested injunctive relief. *Big O Tires*, 167 F. Supp. 2d at 1228. Further still, the public has an interest in being able to rely on the high quality of the services, particularly information on outdoor and recreational experiences, that Outside offers in connection with the OUTSIDE® Marks, and Outside cannot control Defendants' misinformation. *See Jayme LLC v. Cheyenne Hotels LLC*, No. 18-CV-01014-RBJ, 2018 WL 6249690, at *5 (D. Colo. July 17, 2018) ("It is obviously not adverse to the public's interest to have accurate information published on the various online websites").

### E. *Ex Parte* Relief is Warranted

In order for the Court to grant Outside's requested *ex parte* temporary restraining order, Outside must set forth "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant

20070217.10

before the adverse party can be heard in opposition," and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

Outside has identified specific facts sufficient to satisfy each of these requirements.

*First*, Outside is already suffering immediate and irreparable injury, loss, or damage as a result of Defendants' ongoing illegal activities. *See supra* Section IV.B. This harm will only be compounded if Defendants are permitted to continue their unlawful acts.

*Second*, the requested *ex parte* relief without notice is necessary because if Defendants receive notice of this lawsuit, they are likely to dispose of the Infringing Domain Name as evidenced, for example, by their prior indication to Outside of other potential buyers of the Infringing Domain Name and their threats to sell to those buyers, often imposed with time limits. *See* Lackman Decl. ¶¶ 5-7; *Statera, Inc. v. Henrickson*, No. CIV.A. 09-CV-01684-J, 2009 WL 2169235, at *4 (D. Colo. July 17, 2009); *U2 Home Entm't, Inc. v. Chun Pook Tan*, 209 F. Supp. 2d 299, 300 (S.D.N.Y. 2002) (*ex parte* relief is appropriate where, as here, injunctive relief with notice will not suffice because "a danger exists of destroying or transferring infringing goods[.]" (citation omitted)).

Outside has also met each of the criteria for the issuance of an *ex parte* temporary restraining order under the Lanham Act for "a violation that consists of using a counterfeit mark[.]" 15 U.S.C. § 1116(d)(1)(A). The Infringing Domain Name, outside.com, is a counterfeit website as it misappropriates Outside's registered word mark OUTSIDE® verbatim. *See Rylee & Cru, Inc. v. Zhu*, No. 23-CV-00120-PAB-STV, 2024 WL 2111572,

at *4 (D. Colo. May 10, 2024) (website that copied mark verbatim is "a counterfeit site"). With respect to the security requirement, the Act states the court may determine what security will be adequate to warrant the *ex parte* relief. *Id.* at § 1116(d)(4)(A). Here, in light of the lack of harm to Defendants, Outside respectfully submits that no security bond is necessary. *See Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964) ("if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary."); *Carranza v. Reams*, 614 F. Supp. 3d 899, 921-22 (D. Colo. 2020) (waiving security requirement).

Outside has certified that it has not publicized this application. Gorman Decl. ¶ 1. The Infringing Domain Name will be seized at Outside's principal place of business located at 1600 Pearl St., Suite 300, Boulder, Colorado, as identified in the Proposed Order (though this requirement is essentially moot given that the Infringing Domain Name is digital). The remaining requirements (likelihood of success, immediate and irreparable injury, harm to Outside outweighs harm to Defendants, and Defendants would "make such matter inaccessible to the court, if the applicant were to proceed on notice to" Defendants) are established in the discussion above. *See supra* Sections IV.A-D.

Accordingly, the *ex parte* temporary restraining order, as well as the preliminary injunction, is warranted here.

27

## V.       CONCLUSION

In light of the foregoing, Outside respectfully requests that the Court grant the relief requested, immediately directing Defendants to cease and desist operation of the Infringing Website and provisionally transfer the Infringing Domain Name to Outside, until a preliminary injunction is decided.


DATED:  August 14, 2024                    Respectfully submitted,

                                           By:  */s/ Carolyn Juarez*
                                           Carolyn Juarez
                                           Neugeboren O'Dowd PC
                                           726 Front St., Ste. 220
                                           Louisville, CO  80027
                                           T: (720) 536-4904
                                           F: (720) 536-4910
                                           carolyn@nodiplaw.com

                                           Eleanor M. Lackman
                                           (Admission Pending)
                                           Andrew Nietes
                                           (Admission Pending)
                                           Mitchell Silberberg & Knupp LLP
                                           437 Madison Ave., 25th Floor
                                           New York, NY  10022
                                           T:  (212) 878-4890
                                           eml@msk.com
                                           afn@msk.com

                                           *ATTORNEYS FOR PLAINTIFF*
                                           *OUTSIDE INTERACTIVE, INC.*

20070217.10