IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez

Civil Action No. 1:24-cv-02251-RMR

OUTSIDE INTERACTIVE, INC.,

    Plaintiff,

v.

JOSHUA BOLIN et al.,

    Defendants.

## ORDER

This matter is before the Court on the portion of Plaintiff Outside Interactive, Inc.'s ("Outside") *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, ECF No. 2, that seeks a temporary restraining order ("TRO"). The Court has jurisdiction over the case under 28 U.S.C. §§ 1331 and 1338 and 15 U.S.C. §§ 1051*, et seq*., and 1121.

### I.    BACKGROUND

Outside's *ex parte* application for a temporary restraining order asks this Court to immediately order Defendants cease and desist from operating an infringing website (the "Infringing Website") at www.outside.com (the "Infringing Domain Name"), and that Defendant Joshua Bolin, the owner, provisionally transfer the Infringing Domain Name to Outside or, in the alternative, be prohibited from selling, transferring, or otherwise

disposing of the Infringing Domain Name. Outside argues that urgent intervention is necessary because Defendants have recently posted on the Infringing Website at the Infringing Domain Name and have repeatedly threatened to sell the Infringing Domain Name to a third party outside of Outside's reach unless Outside agrees to purchase the Infringing Domain Name from Defendants at an exorbitant price.

For decades, Outside has been a leading provider of active lifestyle content, video, events, and services for outdoor enthusiasts. ECF No. 2 at 3. Outside currently reaches 80 million consumers across its network of 25 media, digital, and technology platforms, including Outside's AI-powered adventure concierge, which launched in January 2024. ECF No. 2-3 ¶ 2. As reflected in the U.S. Patent & Trademark Office ("USPTO") records, Outside has been using the trademark OUTSIDE® for informational publications pertaining to recreation since 1976, before the internet was founded. ECF No. 2-2 ¶ 2. Since then, Outside's trademark rights and portfolio have grown dramatically. In 1994, it launched its magazine Outside, which provides information in the fields of outdoor sports, fitness, and recreational activities. *Id.* In the mid-to-late 1990s, Outside expanded with an online presence, television channel, travel, transportation, and retail store offerings and a book imprint. *Id.* It has offered travel agency services for more than a decade as well as various other goods and services under dozens of sub-brands offered by, and recognized as affiliated with, Outside. ECF No. 2-3 ¶ 2. This includes "Scout – powered by Outside AI," Outside's AI-powered adventure concierge. *Id.*

The USPTO records show that Outside owns all right, title, and interest in and to the marks in its OUTSIDE® family of marks, including but not limited to OUTSIDE®,

OUTSIDE BOOKS®, OUTSIDE FILMS®, OUTSIDE GO®, OUTSIDE ONLINE®, OUTSIDE TELEVISION®, OUTSIDE TV®, OUTSIDE EVENTS®, and various designs and stylizations thereof (collectively, the "OUTSIDE® Marks"). ECF No. 2-2 ¶ 3. Outside obtained the first of these Registrations in 1988 based on a first use date in commerce of November 1, 1976. *Id.* ¶ 4. As identified in the Registrations, Outside has offered and continues to offer a wide variety of online services in connection with the OUTSIDE® Marks. *Id.*, Ex. A. The Registrations for the OUTSIDE® Marks are in full force and effect. *Id.*

Outside alleges that the Infringing Domain Name was first registered in 1993, after OUTSIDE® became a registered trademark of Outside, by a third party other than Defendants. ECF No. 2 at 5. The Infringing Domain Name continued to transfer hands until Defendant Bolin ultimately came to own it at some point in time. *Id.* In late April 2024, Bolin through David Hill, a managing director for Defendant Westlake Securities, which purported to act on behalf of Bolin, contacted Outside with a proposal to sell the Infringing Domain Name to Outside. ECF No. 2-3 ¶ 3. Outside soon learned that in addition to Bolin's plan to commercialize the Infringing Domain Name by trying to sell it, Bolin had launched the Infringing Website. *Id.* Hoping to avoid litigation, Outside and Defendants engaged in a series of conversations from April to June 2024, attempting to negotiate a potential purchase at a reasonable price. *Id.* ¶ 4. During these discussions, Defendants claimed that the Infringing Website offered various services, including an AI-driven search engine for outdoor activities, which they indicated would be a threat to Outside's business model and that acquiring them could "save Outside's business." *Id.* Defendants allegedly

admitted that they get "lots of emails" mistakenly at the Infringing Domain Name, including with "sensitive information" from individuals falsely believing that they were corresponding with Outside, and that the Infringing Website was seeing significant traffic already on the back of the Outside name based on the confusion of consumers. *Id.*

Defendants demanded that because of this confusion, Outside should pay between 15 million and 25 million dollars to purchase the Infringing Domain Name. *Id.* ¶ 5. Defendants represented that other buyers, including a "large retailer" had expressed interest in purchasing the Infringing Domain Name. *Id.* Unless Outside agreed to pay the demanded price, Defendants indicated they would proceed with their competitive "AI driven" business model or the Infringing Domain Name would be lost to another buyer. *Id.* Outside would not agree to pay the "exorbitant" price.

Until early August, after Outside's counsel communicated with Defendants, the "About Us" page of the Infringing Website purported to offer many of the same services that Outside offers in connection with its OUTSIDE® marks, including offering AI algorithms to suggest outdoor experiences, real-time information on weather conditions and trail updates, travel booking services, and location-based map services. *Id.* ¶ 6, Ex. A. A search of the Infringing Website would return content on outdoor experiences, travel planning, products, and similar information. *Id.* ¶ 7, Ex. B. Additionally, the copyright notice on the Infringing Website identified "Outside" as the owner of the website. *Id.* ¶ 8, Ex. C. Searching the term "outside" in the search bar on the Infringing Website returned an article about planning outdoor experiences and Outside's OUTSIDE® mark, which hyperlinks to an article about Outside's publication, *Outside*. *Id.* ¶ 9, Ex. D.

In August 2024, after Outside's counsel wrote to Defendants advising them of their unlawful and infringing acts, Bolin updated the content of the Infringing Website to rephrase and change the depiction of some of its offerings. *Id.* ¶ 12, Ex. F. Nevertheless, the search for "outside.com" on the Infringing Website continues to return a description of Outside, a reference to Outside's website, and a link to Outside's website. *Id.* ¶ 9.

Given this behavior, Outside filed a complaint asserting claims for cybersquatting and trademark infringement. ECF No. 1. Outside argues that the Court should issue a TRO because it is likely to succeed on the merits as to each of its claims, the trademark claim carries a presumption of irreparable injury to Outside, Defendants would face no harm, and the public has an interest in avoiding customer confusion resulting from cybersquatting. Outside further argus that an *ex parte* order is appropriate here because Defendants would be likely to put the Infringing Domain Name beyond reach.

## II.     LEGAL STANDARD

To succeed on a motion for a temporary restraining order, the moving party must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 US. 7, 20 (2008)); *see also Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d

1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted). Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir. 1989), "is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). The same considerations apply to the issuance of a temporary restraining order. *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980).

### III.   ANALYSIS

For the following reasons, the Court finds that Outside has satisfied the four factors for issuance of a temporary restraining order.

#### A.   Likelihood of Success on the Merits

Outside's complaint includes claims for cybersquatting, trademark infringement, unfair competition, and contributory trademark infringement. ECF No. 1 ¶¶ 29-63. The Court addresses the likelihood of success on the merits as to each claim.

##### 1.   Cybersquatting Claims

To succeed on a claim for cybersquatting under Section 43(d) of the Lanham Act, a plaintiff must establish: (1) that its trademark was distinctive at the time of the defendant's registration of the domain name; (2) that the domain name registered, trafficked in, or used by the defendant was identical or confusingly similar to the trademark; and (3) that the defendant used or registered the domain name with a bad faith intent to profit. *Crossfit, Inc. v. 5280 Realty, Inc.*, 157 F. Supp. 3d 954, 957-58 (D. Colo. 2016). The Court finds that Outside has shown a likelihood of success on the merits as to each element of its cybersquatting claim.

First, the USPTO records reflect that Outside has been using the trademark OUTSIDE® for informational publications pertaining to recreation since 1976 and has obtained multiple federal trademark registrations for OUTSIDE® and its entire family of OUTSIDE® marks. ECF No. 2-2 ¶¶ 2-4; *see CrossFit, Inc. v. Jenkins*, 69 F. Supp. 3d 1088, 1098 (D. Colo. 2014) (finding registration of a trademark evidences the distinctiveness of the mark in cybersquatting claim).

Second, Outside alleges that Defendant Bolin admittedly has registered and uses the Infringing Domain Name, outside.com. Outside.com is at minimum confusingly similar, if not identical, to the mark OUTSIDE® and family of OUTSIDE® Marks, as it copies the root mark OUTSIDE® in its entirety. The addition of the generic suffix ".com" does nothing to change this analysis. *See Ball Dynamics Int'l, LLC v. Saunders*, No. 16-CV-00482-NYW, 2016 WL 7034974, at *7 (D. Colo. Dec. 1, 2016) (finding URLs confusingly similar to plaintiff's mark as they "merely change the domain extension"); *see also 5280 Realty*, 157 F. Supp. 3d at 958-59; *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201 (6th Cir. 2004) (accused domain name "foradodge.com" is confusingly similar to the trademark DODGE for autos)).

Finally, Outside has satisfied the third element because Defendants have attempted to sell the Infringing Domain Name to Outside at an exorbitant price and admitted that the purpose in registering and using the Infringing Domain Name has been to misdirect Outside's consumers to the Infringing Website, even after Outside warned them of the possibility of confusion. *See 5280 Realty,* 157 F. Supp. 3d at 960 ("The quintessential example of a bad faith intent to profit is when a defendant purchases a

7

domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price."); *Jenkins*, 69 F. Supp. 3d at 1100-01 (finding bad faith from defendant's continued use of a domain name after plaintiff informed him of a likelihood of confusion); *Ball Dynamics Int'l,* 2016 WL 7034974, at *7 (likely success on merits where defendant used URLs to divert traffic from plaintiff's to defendant's site). Thus, Outside has demonstrated a likelihood of success on the merits on its cybersquatting claims.

        2.    <u>Infringement Claims</u>

Claims for "trademark infringement (15 U.S.C. § 1114) and unfair competition (15 U.S.C. § 1125(a)) . . . include the same elements: (1) [Plaintiff] has a protectable interest in the trademark; (2) [Defendant] has used an identical or similar trademark in commerce; and (3) [Defendant] has likely confused customers by using a similar trademark." *Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1120 (10th Cir. 2014). Here, too, Outside has shown a likelihood of success on the merits of these claims.

First, Outside's Registrations for the OUTSIDE® Marks constitute "prima facie evidence of both the mark's validity and the registrant's exclusive right to use it in commerce." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013). Several of the Registrations have become incontestable pursuant to 15 U.S.C. § 1065. *See* ECF No. 2-2, Ex. A. As such, the Registrations constitute "conclusive evidence" of Outside's right to use the marks. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 924 (10th Cir. 1986).

8

Second, Defendant Bolin has used highly similar trademarks to the OUTSIDE® Marks in commerce. Not only does the Infringing Domain Name, outside.com, copy Outside's word mark OUTSIDE® verbatim in its entirety, the Infringing Website also prominently features the word mark OUTSIDE® and purported to be owned by "Outside." *See* ECF No. 2-3 ¶¶ 6-9. Again, there can be no meaningful dispute that Bolin uses highly similar marks in commerce.

Third, Outside has shown a likelihood of confusion. *See KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004) ("It is evident...that § 1115(b) places a burden of proving likelihood of confusion (that is, infringement) on the party charging infringement even when relying on an incontestable registration..."). Courts examine six non-exhaustive factors to determine likelihood of confusion: (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting the mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks. *Affliction Holdings, LLC v. Utah Vap or Smoke*, LLC, 935 F.3d 1112, 1115 (10th Cir. 2019).

"[T]he degree of similarity is the most important factor," *id.*, and as noted above, the Infringing Website uses a mark which is similar to Outside's marks. Although the coloring and font is different, the Infringing Website identifies itself as "Outside" in large letters on the homepage. Turning to the next two factors, Defendants have admitted they intend to mislead consumers into believing the Infringing Website is affiliated with Outside, and further, that there has been actual confusion, with consumers and potential

9

business partners contacting the Infringing Website and believing they were corresponding with Outside. *See* ECF No. 2-3 ¶ 4; *Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Med. Ctr.*, LLC, 503 F. App'x 616, 621 (10th Cir. 2012) (citing misplaced consumer inquiries in upholding preliminary injunction); *Cent. Bancorp, Inc. v. Cent. Bancompany, Inc.*, 385 F. Supp. 3d 1122, 1144 (D. Colo. 2019) (granting preliminary injunction on similar grounds).

The Infringing Website also purported to and did provide the exact same services that Outside offers, and for which it holds Registrations covering, including providing information, planning, and booking resources for recreational experiences, online community boards to connect with outdoors enthusiasts, online retail services of recreational products, and location-based mapping services. *See* ECF No. 2-3 ¶¶ 6-9; *Cent. Bancorp, Inc. v. Cent. Bancompany, Inc.*, 385 F. Supp. 3d 1122, 1144 (D. Colo. 2019) (granting preliminary injunction, highlighting "substantially overlapping services"). Given the nature of an online marketplace, consumers are not likely to exercise great care in selecting these services, especially considering the Infringing Domain Name and Infringing Website feature the OUTSIDE® word mark as well as provides Outside's content and links to Outside's website when searching for the terms "outside" or "outside.com." Additionally, the search feature on the Infringing Website contain almost identical offerings of what Outside's Scout AI-driven search engine offers in a substantially similar layout. Finally, Outside has used and promoted its OUTSIDE® Marks continuously for nearly half a century, resulting in 80 million consumers currently using Outside's services that it offers in connection with the OUTSIDE® Marks, thus

10

demonstrating their commercial strength. See ECF No. 2-3 ¶ 2; ECF No. 3-2 ¶¶ 2, 4. Thus, the evidence establishes a likelihood of confusion—confusion that Bolin has admitted he intends to cause and has been successful in causing.

### 3. Contributory Infringement Claim

Outside's final claim is for contributory trademark infringement against Defendant Westlake Securities, LLC. ECF No. 1 at 19. "Contributory infringement occurs when the defendant either (1) intentionally induces a third party to infringe on the plaintiff's mark or (2) enables a third party to infringe on the mark while knowing or having reason to know that the third party is infringing, yet failing to take reasonable remedial measures." *1-800 Contacts*, 722 F.3d at 1249.

Outside alleges that Westlake Securities has been complicit in the attempted extortion of Outside in the sale of the Infringing Domain Name. Westlake Securities initially approached Outside on behalf of Bolin in an attempt to sell the Infringing Domain Name to Outside. ECF No. 2-2 ¶ 3. In the parties' discussions, Westlake Securities, equally with Bolin, claimed that the Infringing Website offered various services, including the AI-driven search engine, and indicated that the Infringing Website would benefit from traffic and readers from Outside. *Id.* ¶ 4. Westlake Securities, together with Bolin, also indicated that they were getting "lots of emails" mistakenly at the Infringing Domain Name that were intended for Outside. *Id.* Westlake Securities participated in the demand for Outside's payment and received the correspondence from Outside advising it of its unlawful and infringing acts. *Id.* ¶ 10. These actions demonstrate Westlake Securities' knowledge of Bolin's infringement and that it did nothing to halt such infringement and

11

indicate that Westlake Securities encouraged Bolin to undertake the infringement. This supports a finding that Westlake Securities has committed contributory infringement. *1-800 Contacts*, 722 F.3d at 1251.

Accordingly, Outside has made the requisite "strong showing" that it is likely to prevail on its claims for cybersquatting, trademark infringement, and contributory infringement under the Lanham Act warranting the injunctive relief requested.

### B. Irreparable Harm

Under the Trademark Modernization Act, a plaintiff seeking a temporary restraining order on the basis of trademark infringement "shall be entitled to a rebuttable presumption of irreparable harm upon . . . a finding of likelihood of success on the merits." 15 U.S.C. § 1116(a). Because Outside has demonstrated a likelihood of success on the merits of its trademark claim, it is entitled to the presumption of irreparable harm as to its trademark claim. And beyond this presumption, Outside has shown that the failure to issue a temporary restraining order will cause irreparable harm to its goodwill, particularly considering that Defendants have informed Outside of consumers mistakenly contacting the Infringing Website while attempting to contact Outside. *See Bray v. QFA Royalties LLC*, 486 F. Supp. 2d 1237, 1249 (D. Colo. 2007) (loss of goodwill constitutes irreparable injury).

### C. Balance of Equities and Public Interest

The Court also finds that the balance of the equities favors Outside. Outside has suffered, and will continue to suffer, irreparable harm to its business, and the value, goodwill, and reputation built up in and associated with the OUTSIDE® Marks, as a result

12

of Defendants' willful and knowing cybersquatting and infringement. On the other hand, there is little potential harm to Defendants.

Further, the public interest is served by the enforcement of intellectual property rights and avoiding confusion by the public. *Port-a-Pour, Inc. v. Peak Innovations, Inc.*, 49 F. Supp. 3d 841, 873 (D. Colo. 2014). As Plaintiff has established a likelihood of consumer confusion created by Defendants' trademark infringement, it logically follows that the public interest would be damaged if a TRO is not issued. *See Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1228 (D. Colo. 2001). Further still, the public has an interest in being able to rely on the high quality of the services, particularly information on outdoor and recreational experiences, that Outside offers in connection with the OUTSIDE® Marks, and Outside cannot control Defendants' misinformation. *See Jayme LLC v. Cheyenne Hotels LLC*, No. 18-CV-01014-RBJ, 2018 WL 6249690, at *5 (D. Colo. July 17, 2018) ("It is obviously not adverse to the public's interest to have accurate information published on the various online websites").

### D.  *Ex Parte* Relief is Warranted

In order for the Court to grant Outside's requested *ex parte* temporary restraining order, Outside must set forth "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). Outside has satisfied these requirements.

As previously stated, Outside's affidavits confirm that it is suffering immediate and irreparable injury, loss, or damages as a result of Defendants' ongoing activities. Under the circumstances of this case, notice is not required because Outside has attested that if Defendants receive notice of this lawsuit, they are likely to dispose of the Infringing Domain Name as evidenced, for example, by their prior indication to Outside of other potential buyers of the Infringing Domain Name and their threats to sell to those buyers, often imposed with time limits. *See* ECF No. 2-2 ¶¶ 5-7; *Statera, Inc. v. Henrickson*, No. CIV.A. 09-CV-01684-J, 2009 WL 2169235, at *4 (D. Colo. July 17, 2009); *U2 Home Entm't, Inc. v. Chun Pook Tan*, 209 F. Supp. 2d 299, 300 (S.D.N.Y. 2002) (*ex parte* relief is appropriate where, as here, injunctive relief with notice will not suffice because "a danger exists of destroying or transferring infringing goods[.]" (citation omitted)).

E.     Security

Under Fed. R. Civ. P. 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A trial court has "wide discretion under Rule 65(c) in determining whether to require security." *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (internal quotations omitted). Outside argues that it should not be required to post bond because of its strong likelihood of success on the merits and in light of the lack of harm to Defendant. Because Plaintiff has demonstrated a high likelihood of success on the merits in its application for an *ex parte* TRO, the Court will

require Plaintiff to pose a minimal bond in the amount of $5,000. *See Rylee & Cru, Inc*, 2023 WL 355945, at *7.

### F. Scope of the Order

Outside's proposed order asks the Court to order Defendants and the registrar, GoDaddy.com, LLC and any registar or domain authority provided notice, to transfer the Infringing Domain to Outside. ECF No. 2-1 at 1. Under the Lanham Act, "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C) As to GoDaddy.com or any other registar or domain name, Outside has not alleged that those parties have taken any action that could be considered "aiding and abetting" Defendants' activities. Thus, the Court cannot bind the any registrar or domain authority, including GoDaddy.com to the terms of the TRO. *See Rylee & Cru, Inc,* 2023 WL 355945, at *5-6 (citing *BMW of North America, LLC, v. Issa*, 2020 WL 1325278 (D. Utah Mar. 20, 2020)).

Furthermore, "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits" are disfavored. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), *aff'd Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 546 U.S. 418 (2006). Transferring ownership of the domain name from Defendants to Outside is therefore a disfavored injunction, and the Court declines to order the transfer at this stage. However, Outside has asked in the alternative that Defendants "be prohibited from selling, transferring, or otherwise disposing of the Infringing Domain Name." ECF No. 2 at 1. Given the evidence that Defendants have threatened to put the Infringing Domain Name

out of Outside's reach should their demands not be met, ECF No. 2-2 ¶ 6, the TRO will prohibit Defendants from selling, transferring, or otherwise disposing of the Infringing Domain Name.

## IV.    CONCLUSION

For the reasons set forth herein, it is

1) ORDERED that the portion of Plaintiff's *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, ECF No. 2, that seeks a temporary restraining order is GRANTED;

2) IT IS FURTHER ORDERED that the above-named Defendants Joshua Bolin and Westlake Securities, LLC (together, "Defendants") shall cease and desist from operating the website at the domain www.outside.com, leaving it an unresolved page;

3) IT IS FURTHER ORDERED that Defendants are prohibited from selling, transferring, or otherwise disposing of the domain www.outside.com;

4) IT IS FURTHER ORDERED that Outside shall post a bond or cash deposit with the Clerk of the Court in the amount of $5,000 no later than August 19, 2024;

5) IT IS FURTHER ORDERED that Defendants show cause before this Court, on **August 21, 2024 at 10:00 am** at U.S. District Courthouse, Courtroom A901, 9th Floor, 901 19th Street, Denver, Colorado 80294, why a preliminary injunction on the same terms shall not issue during the pendency of this action;

6) IT IS FURTHER ORDERED that service of a copy of this order to show cause together with the complaint, be made upon the Defendants by the United States

Marshal, state or local police, local deputy sheriffs, or by any person over the age of eighteen (18) years not a party to this action selected for that purpose by the Plaintiff on or before **August 19, 2024** at 5:00 p.m.

DATED: August 16, 2024

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge