**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-02251-RMR

Outside Interactive, Inc.,
      Plaintiff,
v.

Joshua Bolin, *et al.*
      Defendants.

---

**DEFENDANT BOLIN'S RESPONSE TO SHOW CAUSE**
**AGAINST ISSUANCE OF PRELIMINARY INJUNCTION**

---

TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND ............................................................................................................ 2

      A.    Plaintiff and Its "Outside"-Formative Trademark Registrations .................... 2

      B.    The <*Outside.com*> Domain, the OUTSIDE.COM Trademark
            Registration, and Defendant Bolin .................................................................. 3

      C.    Plaintiff's Prior Unsuccessful Attack Against the <*Outside.com*>
            Domain ............................................................................................................. 5

      D.    Plaintiff's Prior Attempts to Solicit Purchase of the
            <*Outside.com*> Domain ................................................................................... 6

      E.    The Present Litigation ...................................................................................... 8

III.  LEGAL STANDARDS .................................................................................................. 9

      A.    Preliminary Injunction ...................................................................................... 9

      B.    Personal Jurisdiction ..................................................................................... 10

IV.   ARGUMENT ............................................................................................................... 10

      A.    Preliminary Injunction Undermined by Plaintiff's Delays ............................. 11

      B.    No Likelihood of Success on the Merits Based on Plaintiff's
            Misleading Factual Allegations ..................................................................... 14

            1.    No Cybersquatting ............................................................................... 14

            2.    No Trademark Infringement or Unfair Competition ............................. 16

      C.    No Personal Jurisdiction Over Bolin in Colorado ......................................... 20

V.    CONCLUSION ........................................................................................................... 23

Defendant Joshua Bolin ("Bolin") submits his response to the Court's August 16, 2024 Order [ECF 10] requiring Bolin to show cause why a preliminary injunction should not issue during the pendency of this action filed by Plaintiff Outside Interactive, Inc. ("Plaintiff" or "Outside Interactive").

## I.      INTRODUCTION

A preliminary injunction should not issue against Bolin for at least the following reasons:

- Plaintiff's delay in filing suit after constructive notice of the "OUTSIDE.COM" trademark registration issued to Bolin's company, Plantsborough, LLC d/b/a Outside.com, on February 16, 2021, Plaintiff's numerous attempts to purchase the *outside.com* domain; and Plaintiff's repeated accusations of trademark infringement in connection with the *outside.com* domain;

- The temporary restraining order ("TRO") issued by the Court was based on misleading factual allegations by Plaintiff—allegations that Bolin disputes;

- Lack of personal jurisdiction over Bolin in Colorado.

Not only should a preliminary injunction not issue against Bolin in this case[1]— Bolin should be dismissed for lack of personal jurisdiction in Colorado.

---

[1] Plaintiff's claim of contributory infringement is against Defendant Westlake Securities alone, and not against Bolin. *See* [ECF 1]. Accordingly, the contributory infringement claim will not be discussed further in this Response.

## II.    BACKGROUND

Plaintiff's combined motion for temporary restraining order and preliminary injunction [ECF 2] relied on material omissions and misleading factual allegations that often were based on unsupported hearsay. The following background section, on the other hand, cites to more than hearsay in support of the facts.

### A.    Plaintiff and Its "Outside"-Formative Trademark Registrations

Plaintiff's motion asserts that its "Outside"-formative trademark registrations cover "providing information, planning, and booking resources for recreational experiences, online community boards to connect with outdoors enthusiasts, online retail services of recreational products, and location-based mapping services, to name just a few." [ECF 2] at p. 21.

This characterization, however, appears to be a mishmash of several different trademark registrations for different its "Outside"-formative marks.

For example, U.S. Trademark Registration No. 2030603 ("OUTSIDE ONLINE") was for "Interactive electronic information services regarding outdoor sports and recreation" [ECF 1-8], appears to correlate to the "providing information, planning, and booking resources for recreational experiences" cited in Plaintiff's motion.[2]

Also, U.S. Trademark Registration No. 2030603 ("OUTSIDE ONLINE") for "Leasing access time to a computer database in the nature of a computer bulletin board in the field of outdoor sports and recreation" [ECF 1-8], appears to correlate to the

---

[2] This and other trademark registrations cited by Plaintiff had originally issued to Mariah Media, Inc., which was Plaintiff's predecessor in interest. Ex. 8 (trademark assignment).

"online community boards to connect with outdoors enthusiasts" cited in Plaintiff's motion.

U.S. Trademark Registration No. 2546325 ("OUTSIDE") for "On-line retail store services . . . featuring outdoor sporting equipment" [ECF 1-8], appears to correlate to the "online retail services of recreational products" cited in Plaintiff's motion.

And U.S. Trademark Registration No. 7232896 ("OUTSIDE") for "GPS navigation services" [ECF 1-8], appears to correlate to the "location-based mapping services" cited in Plaintiff's motion.

There is, however, no "Outside"-formative trademark registration owned by Plaintiff for services such as "an AI-driven search engine for outdoor activities." [ECF 2] at p. 6.

### B.   The *<Outside.com>* Domain, the OUTSIDE.COM Trademark Registration, and Defendant Bolin

There is no dispute that the *<outside.com>* domain name was registered decades ago back in February 1993. Ex. 5.

Plantsborough, LLC, a Georgia company that is not named as a defendant in this action, acquired the *<outside.com>* domain name in June 2018.[3] Bolin Decl. at ¶ 5. Bolin, an individual residing in Texas, was and still is a member who participates in the operation of Plantsborough. *Id.* at ¶ 4.

Furthermore, Bolin disputes the unsupported hearsay testimony by Plaintiff's Head of Mergers & Acquisitions who he was "informed" by some unidentified person

---

[3] The registrar for the *<outside.com>* domain is GoDaddy, an Arizona company. Ex. 5.

that "for several years prior to April 2024," there was no website at the *<outside.com>* domain. [ECF 2-3] at ¶ 3.

Plantsborough started developing an e-commerce business using the *<outside.com>* domain, and filed a trademark application with the U.S. Patent and Trademark Office ("USPTO") on July 9, 2020, for the OUTSIDE.COM mark for use with "On-line retail store services featuring live plants." Bolin Dec. at ¶¶ 6–7; Ex. 7. Notably, the application claimed a date of first use in commerce of July 7, 2020, and was filed with screenshot of the webpage at www.outside.com taken on July 9, 2020 as the required specimen showing the use of OUTSIDE.COM as a trademark for its online business relating to the outdoor activity of growing plants. Ex. 7 at 21.

The application for the OUTSIDE.COM mark was examined and then published for public opposition on December 1, 2020. Ex. 7. No opposition was filed, and the USPTO issued the OUTSIDE.COM mark as U.S. Registration No. 6270864 on February 16, 2021.[4] Ex. 7.

Afterwards, Plantsborough intermittently began testing the *<outside.com>* domain in connection with other services including different types of functional internet searching in 2022 and 2023. Bolin Dec. at ¶ 8. Sometimes, the website at *<outside.com>* would be taken down to assess the test-usage. *Id.* at ¶ 9. AI-search capabilities also were being developed for the *<outside.com>* website in 2023 and 2024 using ChatGPT and Perplexity AI-search-engine applications. *Id.* at ¶ 10. And, in July

---

[4] Even though the OUTSIDE.COM trademark registration is part of the USPTO's searchable database of trademarks, Plaintiff ignored this evidence in its motion [ECF 2].

2024, AI-search capabilities were added to the public-facing *<outside.com>* website for beta testing. Bolin Dec. at ¶ 11.

After Plaintiff's counsel sent the June 28, 2024 cease-and-desist letter to Bolin accusing the AI-enabled *<outside.com>* website of trademark infringement, Bolin had the *<outside.com>* domain focus on the plant-growing covered by the OUTSIDE.COM trademark registration. Bolin Dec. at ¶ 12.

But, in view of the following history of Plaintiff with respect to the *<outside.com>* domain, it is not surprising that Plaintiff was not appeased.

### C.  Plaintiff's Prior Unsuccessful Attack Against the *<Outside.com>* Domain

In 2006, Plaintiff's predecessor-in-interest, Mariah Media, relying on many of the same trademark registrations being asserted in this litigation, filed a Uniform Dispute Resolution Procedure ("UDRP") complaint against a prior owner of the *<outside.com>* domain name for cybersquatting—demanding that the website at *<outside.com>* be "shut down" and the domain name transferred to Plaintiff's predecessor-in-interest.

The website at *<outside.com>* at that time included a "search box" where a search of the word "outside" would deliver "a web page that includes links to third-party sources for discount subscriptions and gift subscriptions to the Complainant's OUTSIDE magazine." Ex. 6 at 4. Even though "searches on the [accused] website generate pages with links to third parties that sell subscriptions to the Complainant's OUTDOOR magazine," the three-member UDRP panel was "unwilling to attribute bad faith to this search software." *Id.* at 7 & 8.

**D.      Plaintiff's Prior Attempts to Solicit Purchase of the *<Outside.com>* Domain**

Plaintiff suggests that Bolin made an unsolicited proposal to sell the *<outside.com>* domain name to Plaintiff in April 2024. [ECF 2].  But that is not true. Numerous times before, it was Plaintiff that had approached Bolin with offers to purchase the *<outside.com>* domain name.

Sometime in 2021, Bolin received an email that appeared to be intended for Plaintiff Outside Interactive, so he contacted Plaintiff's CEO, Robin Thurston, to inform him of the misdirected email communication. Bolin Dec. at ¶ 13. In response, Mr. Thurston demanded that Bolin sell the *<outside.com>* domain name to Plaintiff. *Id.* at ¶ 14. Bolin refused, stating that he had plans to develop a website business using that domain name. *Id.* In response, Plaintiff sent a cease-and-desist letter alleging trademark infringement, but nothing further happened for some two years. *Id.* at ¶ 15.

In September 2023, Bolin received the first of several unsolicited offers to purchase the *<outside.com>* domain name from an unidentified third party who was using GoDaddy as the broker. Bolin Dec. at ¶ 16.

The first offer to acquire the *<outside.com>* domain name was for $75,000. Bolin Dec. at ¶ 17. Bolin turned down that offer, and made no counteroffer. *Id.*

The next offer by the unidentified third party was made on September 25, 2023 for $1.3 million. Bolin Dec. at ¶ 18; Ex. 4. Bolin turned down that offer as well, and again made no counteroffer. *Id.*

The unidentified third party then offered $2.5 million for the *<outside.com>* domain name. Bolin Dec. at ¶ 19; Ex. 4. Again, Bolin turned down the unsolicited offer, and made no counter offer. *Id.*

On October 19, 2023, Bolin received a "Final and Best" offer of $5 million for the *<outside.com>* domain name. Bolin Dec. at ¶ 20; Ex. 4. As before, Bolin turned down the unsolicited offer, and made no counter offer. *Id.*

On November 15, 2023, GoDaddy contacted Bolin to suggest that if the unidentified third party were to increase the offer to $25 million, would Bolin agree? Bolin Dec. at ¶ 21; Ex. 4. Bolin stated that he would agree to sell at that price. Bolin Dec. at ¶ 21.

On December 5, 2023, GoDaddy stated that the "Buyer is working on funding so that we can move forward with the acquisition." Bolin Dec. at ¶ 22. But Bolin received no further communication from GoDaddy about the $25 million purchase price after February 2024. *Id.* at ¶ 23.

Believing that Plaintiff was the unidentified third party, then Bolin had his investment banker, David Hill from West Lake Securities, make an inquiry to Plaintiff. Bolin Dec. at ¶ 24.

During subsequent negotiations between May and July 2024, Plaintiff offered $1 million in stock to Bolin for the *<outside.com>* domain name. Bolin Dec. at ¶ 25. Bolin declined their offer in part because he was concerned about selling the *<outside.com>* domain name in exchange for stock in an "old-school publisher." *Id.* Bolin stated, however, that he would be interested in remaining involved with the *<outside.com>*

7

business after a sale to Plaintiff in order to save that business from Plaintiff's old-school executives who would occasionally send emails to the <*outside.com*> domain instead of Plaintiff's own domain. *Id.*

Bolin also told Plaintiff that $25 million was a fair price because he believed that Plaintiff previously had considered paying that amount as the unidentified third party using GoDaddy as a broker for a straw purchase. Bolin Dec. at ¶ 26. Bolin also justified a $15 million to $25 million sales price as reasonable based on comparative sales of domain names to large retailers who also could be potential buyers. Bolin Dec. at ¶ 27; *see also* Ex. 2. Another reason for a sales price in the millions of dollars was that Bolin believed that it would be significant switching costs including millions of dollars to purchase a new, less desirable, domain name on the open market to replace the <*outside.com*> domain name that he was already using to build his business. Bolin Dec. at ¶ 28.

Importantly, Bolin never stated or even suggested that he intended the website at the <*outside.com*> domain to cause confusion with Plaintiff Outside Interactive. Bolin Dec. at ¶¶ 29–30.

###### E.   The Present Litigation

Some six weeks after their June 28, 2024 letter threatening litigation (Ex. 1), Plaintiff filed the present action on August 14, 2024, together with a combined motion for temporary restraining order and preliminary injunction [ECF 2]. Disputing many of the factual allegations made in Plaintiff's motion, Bolin asserts that the legal standards

for a preliminary injunction have not been met, and there is no personal jurisdiction over him in Colorado in any event.

### III.   LEGAL STANDARDS

#### A.   Preliminary Injunction

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019); *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). The movant's right to relief must be "clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009); *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018).

To succeed on a motion for a preliminary injunction, the moving party must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Defense Council, Inc.*, 555 US. 7, 20 (2008)).

Additionally, The Tenth Circuit has identified three types of preliminary injunctions that are "specifically disfavored": (1) injunctions that alter the status quo; (2) injunctions that require the nonmoving party to take affirmative action; and (3) injunctions affording the movant "all the relief that it could recover at a conclusion of a full trial on the merits." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (internal quotations omitted). Where the movant seeks one these three types of

disfavored injunctions, its motion "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004).

### B.    Personal Jurisdiction

"The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 134 (2014). The personal jurisdiction analysis in Colorado is a single due process inquiry. *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004). And Plaintiff bears the burden of establishing personal jurisdiction. *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011).

The Tenth Circuit conducts a two-step analysis. At the first step, the court examines whether the non-resident defendant has "minimum contacts" with the forum state such "that he should reasonably anticipate being haled into court there." *TH Agric. & Nutrition, LLC v. Ace European Grp., Ltd.*, 488 F.3d 1282, 1287 (10th Cir. 2007) (citations omitted). If the defendant has sufficient contacts, the court then asks whether "exercise of jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice,'" that is, whether the exercise of jurisdiction is "reasonable" under the circumstances of a given case. *Id.* (citations omitted).

### IV.    ARGUMENT

Plaintiff has been trying to acquire the *<outside.com>* domain for years without success. And this case is being driven by Plaintiff's vexatious anger at Bolin's audacity

in refusing to sell the <*outside.com*> domain to Plaintiff for less than what Bolin believes it is worth to the AI-capable business that he is trying to develop.[5]

### A. Preliminary Injunction Undermined by Plaintiff's Delays

Courts have repeatedly held that a party's delay in seeking injunctive relief undermines that party's irreparable harm argument. *See, e.g.*, *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984) (delay in seeking injunctive relief undercuts irreparable harm argument); *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm."). Preliminary injunctions have been denied where the delay was only for a few months. *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (finding that a delay of "ten weeks" suggests there is "no irreparable injury") (citation omitted); *Bear U.S.A. v. A.J. Sheepskin Leather*, 909 F. Supp. 896, 910 (S.D.N.Y. 1995) (denying preliminary injunction in the face of a three-month delay); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) (noting that courts in the Second Circuit "typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months").

Here, Plaintiff has been aware of the <*outside.com*> domain for at least two decades.

---

[5] Bolin believes that he will be entitled to recover his attorneys' fees from Plaintiff as a reverse domain name hijacker under 15 U.S.C. § 1114(2)(d)(iv).

In 2006, Plaintiff's predecessor-in-interest initiated a UDRP proceeding seeking to "shut down" the website at <*outside.com*> domain name and transfer the domain name to Plaintiff's predecessor-in-interest. Ex. 6. The website at <*outside.com*> at that time would deliver "a web page that includes links to third-party sources for discount subscriptions and gift subscriptions to [Plaintiff's] OUTSIDE magazine" in response to a search query for the word "outside." *Id.* Even though such "searches on the [accused] website generate pages with links to third parties that sell subscriptions to [Plaintiff's] OUTDOOR magazine," the three-member panel "unwilling to attribute bad faith to this search software" and denied the UDRP. *Id.* Thus, Plaintiff has known about prior websites at the <*outside.com*> domain which generate pages with links that reference Plaintiff's OUTDOOR magazine since at least 2006.

Years later, in 2021, Bolin contacted Plaintiff's CEO Robin Thurston about a misdirected email communication to the <*outside.com*> domain. Bolin Dec. at ¶ 13. In response, Mr. Thurston demanded that Bolin sell the <*outside.com*> domain name to Plaintiff. *Id.* at ¶ 14. Bolin refused, stating that he had plans to develop a website business using that domain name. *Id.* Indeed, his company already had filed the OUTSIDE.COM trademark application in July of the prior year for online services. Ex. 7.

In response to Bolin's refusal to sell the <*outside.com*> domain, Plaintiff sent a cease-and-desist letter dated November 1, 2021 accusing Plantsborough of trademark infringement, but took no further action. Bolin Dec. at ¶ 15; Ex. 1 (attached thereto as Ex. A).

Some two years later, in September and October 2023, Bolin received unsolicited offers to purchase the *<outside.com>* domain name from an unidentified third party who was using GoDaddy as the broker. Bolin Dec. at ¶¶ 16–20; Ex. 4. The unsolicited offers to acquire the *<outside.com>* domain name started at $75K, which then escalated to $1.3 million, and then to $2.5 million, and then to $5 million. *Id.* Bolin turned down each of these unsolicited offers, and made no counteroffer. *Id.* Bolin believed that Plaintiff was the unidentified third party. *Id.* at ¶ 24.

On November 15, 2023, GoDaddy contacted Bolin to ask whether he would agree to a hypothetical offer of $25 million. Bolin Dec. at ¶ 21; Ex. 4. Bolin stated that he would agree to sell at that price. Bolin Dec. at ¶ 21. On December 5, 2023, GoDaddy stated that the "Buyer is working on funding." *Id.* at ¶ 22. But Bolin received no further communication from GoDaddy about the purchase after February 2024. *Id.* at ¶ 23.

Plaintiff's current counsel later sent Bolin a cease-and-desist letter dated June 28, 2024, making accusations of trademark infringement. Ex. 1. In particular, the letter asserted that an email from Bolin's agent dated May 8, 2024 had "memorialized" a scheme of infringement. *Id.* at p. 3. Thus, Plaintiff believed there was infringement at least as early as May 8th—more than **three months** before filing suit and moving for an injunction on August 14, 2024.

Given this long history of Plaintiff making unsolicited offers to purchase the *<outside.com>* domain (Bolin Dec. at ¶ 16–25); the constructive notice from the December 2020 publication and July 2021 issuance of registered trademark for the OUTSIDE.COM mark in connection with online services (Ex. 7); Plaintiff's cease-and-

desist letter dated November 1, 2021 (Ex. 1 attachment); and Plaintiff's subsequent cease-and-desist letter dated June 28, 2024 (Ex. 1)—Plaintiff's delays in seeking an injunction weigh heavily against the issuance of a preliminary injunction.

### B.   No Likelihood of Success on the Merits Based on Plaintiff's Misleading Factual Allegations

Plaintiff's misleading factual allegations and material omissions do not establish a likelihood of success on the merits for any of its claims that justifies the extraordinary relief of a preliminary injunction.

### 1.   No Cybersquatting

A cybersquatting claim may be brought against a defendant, over which the Court has *in personam* jurisdiction,[6] who registers, traffics in, or uses a domain name "identical or confusingly similar to" a distinctive trademark with the "bad faith intent to profit." 15 U.S.C. § 1125(d)(1)(A)(i)–(ii).

Here, there is no "bad faith" here for Plaintiff's claim of cybersquatting.

First, the bona fide offering of online retail services by Bolin's company, Plantsborough, using the <*outside.com*> website is evidence that there was not bad faith. 15 U.S.C. § 15 U.S.C. § 1125(d)(1)(B)(i)(III) ("prior use, if any, of the domain name in connection with the bona fide offering of any goods or services").

Second, the OUTSIDE.COM trademark registration (Ex. 7) obtained by Bolin's company, Plantsborough, also is evidence that there was not bad faith. 15 U.S.C.

---

[6] As discussed later in the Response, there is no personal jurisdiction over Bolin in Colorado.

§ 1125(d)(1)(B)(i)(I) ("the trademark or other intellectual property rights of the person, if any, in the domain name").

Third, Bolin repeatedly turned down unsolicited offers from Plaintiff who wanted to purchase the *<outside.com>* domain from Bolin. Bolin Dec. at ¶¶ 16–20; Ex. 4. These unsolicited offers from Plaintiff escalated from $75,000 to $5 million. *Id*. Notably, it was Bolin who received these unsolicited offers—again, Bolin did not offer to sell the *<outside.com>* domain name for financial gain. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VI) ("offer to transfer, sell, or otherwise assign the domain name to the trademark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services"). Moreover, Bolin did not attempt to sell the *<outside.com>* domain name at an exorbitant price. At most, Bolin merely discussed why these prices for the domain name that were consistent with what Bolin believed Plaintiff had offered unsolicited in the past, and which Bolin believed were supported by comparable domain name sales. Bolin Dec. at ¶ 25.

Fourth, Bolin disputes Plaintiff's allegations of extortion which misrepresent the substance of Bolin's actual statements. Bolin never stated or even suggested that he intended the website at the *<outside.com>* domain to cause confusion with Plaintiff Outside Interactive. Contrary to Plaintiff's misrepresentations, Bolin never said that the purpose in registering and using the *<outside.com>* domain name was to misdirect Outside's customers to the *<outside.com>* website, nor was that ever his intent. Bolin Dec. at ¶¶ 29–30; Ex. 4.

Plaintiff does not have a likelihood of success on the merits for its claim of cybersquatting, especially where Plaintiff is relying on unsupported hearsay testimony that Bolin flatly denies.

### 2.    No Trademark Infringement or Unfair Competition

In evaluating whether there is a likelihood of confusion for trademark infringement, the following six non-exhaustive factors are considered: (1) evidence of actual confusion; (2) the strength of the contesting mark;[7] (3) the degree of similarity between the competing marks; (4) the intent of the alleged infringer in adopting the contested mark; (5) the degree of care that consumers are likely to exercise in purchasing the parties' products; and (6) the similarity of the parties' products and the manner in which they market them. *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013); *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002). "These factors are interrelated and no one factor is dispositive." *Sally Beauty*, 304 F.3d at 972. "[T]he final determination of likelihood of confusion must be based on consideration of all relevant factors." *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998).

---

[7] To the extent Plaintiff believes that its asserted trademark registrations are commercially strong because they are "incontestable," that status carries minimal—if any—weight in the commercial-strength inquiry. *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1008 n.13 (10th Cir. 2014) ("the fact that Hornady's mark is statutorily incontestible does not resolve the commercial strength inquiry"); *see also Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986) ("Incontestable status does not make a weak mark strong.").

Here, Plaintiff's trademark infringement claim is based on an AI hallucination that Plaintiff fabricated by performing a search of "outside.com" on the accused beta <*outside.com*> website.

Notably, a search of "outside.com" on Perplexity.com (the AI-enabled search engine that was incorporated into the beta website at <*outside.com*> in July 2024) generates a webpage (reproduced below) similar to what Plaintiff accuses of infringement here. Ex. 9.



Other search engines such as Bing also generate similar results when "outside.com" is searched. Ex. 10. Below is the webpage generated by Bing's AI-powered Deep search.



This is not trademark infringement. It is just how AI-powered search engines work.

This is analogous to the failed UDRP action that Plaintiff's predecessor-in-interest had filed back in 2006 based on search results for "outside" on the website at <*outside.com*> at that time which "generate[d] pages with links to third parties that sell subscriptions to [Plaintiff's] OUTDOOR magazine." Ex. 6. The UDRP panel was "unwilling to attribute bad faith to this search software." *Id.* The UDRP panel did not find such searching to be improper, and neither should this Court.[8]

None of these instances involved predetermined webpages. Instead, all of them involved webpages dynamically generated by search software in response to a specific

---

[8] Bolin specifically noted this UDRP decision in his June 28, 2024 email to Plaintiff's counsel. Ex. 3. But Plaintiff ignored this history in the motion [ECF 2] filed some six weeks later.

query by an unrelated user. The accused webpage at <*outside.com*> did not exist until Plaintiff independently initiated its own "outside.com" search query into the AI-powered search engine.

Separately, the OUTSIDE.COM trademark registration issued by the USPTO to Bolin's company constitutes "prima facie evidence of both the mark's validity and the registrant's exclusive right to use it in commerce." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013). And the USPTO issued the OUTSIDE.COM trademark registration to Bolin's company notwithstanding Plaintiff's numerous "Outside"-formative trademark registrations. The USPTO was obligated to consider whether there was a likelihood of confusion with an existing trademark registration under Section 2(d) of the Trademark Act during examination. 15 U.S.C. § 1052(d); *see also B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1307 (2015) (holding that the likelihood-of-confusion analysis for the purpose of registration is the same as the likelihood-of-confusion analysis for the purpose of infringement). While not dispositive, the presumptively valid OUTSIDE.COM trademark registration issued by the USPTO to Bolin's company is relevant to the question of Plaintiff's likelihood of success on the merits of proving a likelihood of confusion for trademark infringement against the OUTSIDE.COM mark.

With respect to any alleged actual confusion, Plaintiff's only evidence is unsupported hearsay testimony about a few errant emails sent to the <*outside.com*> domain. Such anecdotal evidence is insufficient. *Water Pik*, 726 F.3d at 1150 ("isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in

the confusion analysis"); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d

1084, 1092 (10th Cir. 1999) (finding that a "handful of anecdotal evidence" was "de

minimis").

Lastly, Bolin did not admit to having intended to cause confusion between the

<*outside.com*> website and Plaintiff Outside Interactive. Bolin Dec. at ¶¶ 29–30. That

was a fabrication by Plaintiff which Bolin flatly denies.

In view of the above, especially where Plaintiff is relying on fabricated evidence,

Plaintiff does not have a likelihood of success on the merits for its claim of trademark

infringement.

**C.    No Personal Jurisdiction Over Bolin in Colorado**

There are two types of personal jurisdiction: "general" and "specific." *Bristol-*

*Myers Squibb*, 137 S. Ct. at 1779–80. General jurisdiction only exists where a

defendant can fairly be considered at home, such as a domicile for individuals. *Daimler*

*AG v. Bauman*, 571 U.S. 117, 139 (2014). And, for specific jurisdiction, the suit must

arise out of or relate to the defendant's contacts with the forum. *Bristol-Myers Squibb*,

137 S. Ct. at 1780; *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915,

919, 131 S. Ct. 2846 (2011) (specific jurisdiction may be exercised only with respect to

"activity or an occurrence that takes place in the forum State and is therefore subject to

the State's regulation"). For the requisite minimum contacts for specific personal

jurisdiction, the plaintiff must establish: "(i) that the defendant must have 'purposefully

directed its activities at residents of the forum state,' and (ii) that 'the plaintiff's injuries

must arise out of [the] defendant's forum-related activities.'" *Old Republic Ins. v. Cont'l*

*Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017) (quoting *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011)).

Here, Bolin is an individual who resides in Texas, who maintains no bank accounts or real property in Colorado, and who personally pays no taxes to the State of Colorado. Bolin Decl. at ¶¶ 2–3. Thus, there is no basis for general jurisdiction over Bolin in Colorado.

For specific jurisdiction, Plaintiff must establish that Bolin purposefully directed his activities at Colorado or performed some act by which he purposely availed himself of the privilege of conducting activities in Colorado. *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995) (finding no personal jurisdiction in Utah over Nevada defendants who negotiated with a Utah company regarding real property in Nevada).

Simply negotiating a contractual relationship with a Colorado entity is not enough. *See, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); *Iowa Elec. Light and Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1303 (8th Cir. 1979) ("Merely entering into a contract with a forum resident does not provide the requisite contacts between a [nonresident] defendant and the forum state."). In *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1200 (Colo. 2005), the Colorado Supreme Court held that there was no personal jurisdiction notwithstanding numerous communications that defendant AGD [a Russian corporation] sent to the plaintiff in Colorado because "AGD's

attenuated and fortuitous contacts, coupled with the remote nexus between AGD's Colorado contacts and this litigation [involving contracts over a Russian diamond deposit], fail to raise an inference of specific jurisdiction over AGD."

Here, Plaintiff's Complaint alleges that Bolin "offered" to sell the *<outside.com>* domain name to Plaintiff, a Colorado company, and "threatened" to sell that domain name to another company if Plaintiff did not buy it. [ECF 1] at ¶ 5.

Bolin denies both allegations. First, it was Plaintiff who repeatedly offered to purchase the *<outside.com>* domain name. Bolin Dec. at ¶¶ 14, 16-20 & 25. Second, Bolin never threatened to sell the *<outside.com>* domain name to a third party if Plaintiff did not buy it. *Id.* at ¶ 30. Indeed, Bolin had repeated told Plaintiff that he intended to build his own online business using that domain name. *Id.* at ¶¶ 14 & 28. Bolin neither purposefully directed his activities at Colorado or performed some act by which he purposely availed himself of the privilege of conducting activities in Colorado.

The cases cited in Plaintiff's Complaint ([ECF 1] at ¶ 5) are distinguishable.

In *CrossFit, Inc. v. Jenkins*, 69 F. Supp. 3d 1088, 1094 (D. Colo. 2014), the defendant was a resident of Colorado, and thus subject to general jurisdiction in Colorado. The court's comments about transacting business in Colorado by incorporating his company in Colorado that owned the domain name that was the subject of dispute with the plaintiff were dicta. In any event, neither fact applies here because Bolin resides in Texas, and Plantsborough is a Georgia company. Bolin Dec. at ¶¶ 4–5. Furthermore, the court did not consider the U.S. Supreme Court's guidance in *Walden v. Fiore*, 571 U.S. 277, 284, 134 S. Ct. 1115, 188 L.Ed.2d 12 (2014) which

held that, consistent with due process, a relationship must arise out of contacts that the defendant himself created with the forum itself, not with persons residing there. "[T]he plaintiff cannot be the only link between the defendant and the forum." *Id.* at 285. Yet, here, Plaintiff is the only link between Bolin and Colorado. This is not enough to establish personal jurisdiction over Bolin in Colorado.

In *Your True Nature, Inc. v. JF Show Store*, No. 23-CV-00107-CNS-NRN, 2023 WL 2359234, at *1–*2 (D. Colo. Feb. 14, 2023), the court found personal jurisdiction based on actual sales of accused products to consumers in Colorado through defendant's internet-based e-commerce stores. In the present litigation, however, no such sales to consumers in Colorado are alleged by Plaintiff.

In short, there is no personal jurisdiction over Bolin in Colorado.

## V.     CONCLUSION

Plaintiff's misleading and fabricated facts do not support the issuance of a preliminary injunction against Bolin in this case. Moreover, Bolin should be dismissed for lack of personal jurisdiction in Colorado.

Date: August 21, 2024

  *s/ James Juo*
James Juo
THOMAS P. HOWARD, LLC
842 W. South Boulder Rd., #100
Louisville, CO 80027
Telephone: (303) 665-9845
jjuo@thowardlaw.com

*Counsel for Defendant Joshua Bolin*

EXHIBIT LIST

Exhibit 1:     June 28, 2024 letter with attachments

Exhibit 2:     May 8, 2024 email referenced in the June 28, 2024 letter

Exhibit 3:     June 28, 2024 email

Exhibit 4:     Emails between Bolin and GoDaddy

Exhibit 5:     Screenshot of Whois record for the *<outside.com>* domain

Exhibit 6:     WIPO UDRP Decision No. D2006-1275

Exhibit 7:     USPTO file history for the OUTSIDE.COM trademark registration

Exhibit 8:     Trademark assignment from Mariah Media to Outside Interactive

Exhibit 9:     Screenshot of Perplexity.com's AI search results for "outside.com"

Exhibit 10:    Screenshot of Bing.com's AI search results for "outside.com"